1   Peter Goldstein, SBN 6992
2   PETER GOLDSTEIN LAW CORP
    peter@petergoldsteinlaw.com
3   10161 Park Run Drive, Suite 150
    Las Vegas, Nevada 89145
4   Telephone: (702) 474-6400
    Facsimile: (888) 400-8799

5
    Attorney for Plaintiff,
6   *SONIA ESPARZA, individually, and as*
    *Special Administrator of the Estate of*
7   *FERNANDO MARTINEZ, JR.*

8                      **UNITED STATES DISTRICT COURT**
9                      **DISTRICT OF NEVADA (LAS VEGAS)**

10  SONIA ESPARZA,                          **Case No. 2:23-cv-02161-GMN-MDC**

11                      Plaintiff,

12          vs.                             **SECOND AMENDED COMPLAINT**
                                            **FOR DAMAGES**

13  WELLPATH, LLC; LAS VEGAS
    METROPOLITAN POLICE DEPARTMENT;         **DEMAND FOR JURY TRIAL**
14  KEVIN MCMAHILL; FRED HAAS; BRIAN
    FUCILE; SCOTT ZAVSZA; LEAH              **(1) DELIBERATE INDIFFERENCE**
15  ANDERSON; ALYSSA WILLIAMS;              **TO SERIOUS MEDICAL NEEDS**
    JULIAN ABRAM; DOUGLAS THRASHER;
16  LARRY WILLIAMSON; CATHERINE             **(42 U.S.C. § 1983; NEVADA**
    RYAN; JESSICA ARABSKI; RICHARD          **CONSTITUTION, ARTICLE 1, § 8);**
17  MEDRANO; VIVEK SHAH; COLE CASEY;
    KESHA POLAND; MARIA HOPKINS;            **(2) DEPRIVATION OF FAMILIAL**
18  RACHEL CLARK; KYLE MARTINEAU;           **ASSOCIATION;**
    EARL SALVIEJO; ULYANA
19  BILOSKURSKA; AMY KATHRYN                **(42 U.S.C. § 1983; NEVADA**
    ANAPOLSKY; and DOES 1-10,               **CONSTITUTION, ARTICLE 1, § 8);**
20
                                            **(3) OVERDETENTION**
21                      Defendants,
                                            **(42 U.S.C. § 1983; NEVADA**
22  FERNANDO MARTINEZ SANTOS,               **CONSTITUTION, ARTICLE 1, § 8);**

23                      Nominal Defendant.  **(4) MUNICIPAL LIABILITY,**
                                            **FAILURE TO TRAIN/POLICY AND**
24                                          **CUSTOM (42 U.S.C. § 1983);**

25

26

27

**(5) DISABILITY DISCRIMINATION (42 U.S.C. § 12131 ET SEQ.; 29 U.S.C. § 794 (A));**

**(6) WRONGFUL DEATH (NEVADA STATE LAW);**

**(7) NEGLECT OF A VULNERABLE PERSON (NEVADA STATE LAW);**

**EXHIBIT "A" REDACTED DEATH CERTIFICATE**

**EXHIBIT "B" ORDER APPOINTING SPECIAL ADMINISTRATOR**

Plaintiff SONIA ESPARZA, individually, and as the Special Administrator of the Estate of FERNANDO MARTINEZ, JR. ("Plaintiff") alleges upon information, belief, and personal knowledge:

## JURISDICTION AND VENUE

1. This civil rights action is brought pursuant to 42 U.S.C. section 1983, title II of the Americans with Disabilities Act, section 504 of the Rehabilitation Act, the Fourteenth Amendment to the United States Constitution, and the constitution and laws of the State of Nevada.

2. Jurisdiction is conferred by 28 U.S.C. section 1331, which provides for jurisdiction over actions brough pursuant to the constitution and laws of the United States, section 1343, which provides for jurisdiction over actions brought pursuant to section 1983, and section 1367, which provides for jurisdiction over pendant state law claims.

3. Venue is proper pursuant to 28 U.S.C. section 1391(b)(2) because the events giving rise to this action occurred in this judicial district.

## PARTIES

4. The decedent, FERNANDO MARTINEZ, JR. ("MARTINEZ"), was an individual residing in Clark County, Nevada, who suffered from schizophrenia and other mental illnesses, making him a protected individual under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA").

5.  MARTINEZ is survived by his mother, SONIA ESPARZA ("Plaintiff" or "ESPARZA"), who is an individual residing in Clark County, Nevada. She sues in her individual capacity and as Special Administrator of her son's estate. She seeks all permissible damages under federal and state law.

6.  MARTINEZ is also survived by his father, FERNANDO MARTINEZ SANTOS, who is a nominal defendant to this action.

7.  Defendant LAS VEGAS METROPOLITAN POLICE DEPARTMENT ("LVMPD") is a political and municipal entity and the law enforcement agency for Clark County and the City of Las Vegas, duly organized and existing under the laws of the State of Nevada.

8.  LVMPD, through the Detention Services Division ("DSD"), is responsible for managing Clark County Detention Center ("CCDC") and for ensuring that the detainees held at CCDC are afforded adequate safety, medical and mental health care, and the benefits conferred by the ADA and RA.

9.  LVMPD, through its officials and supervisors at its central offices, facilities, and specialized units, promulgates, implements, and executes policies related to the conditions of confinement at CCDC.

10. LVMPD is also responsible for the training, supervision, discipline, and conduct of all LVMPD's employees and agents. LVMPD is therefore liable to Plaintiff under a theory of *respondeat superior* for all claims where such vicarious relief is available.

11. Defendant Sheriff KEVIN MCMAHILL ("MCMAHILL") was, at all relevant times, the chief law enforcement officer and head of LVMPD, with all of the duties and authority attendant to his position as a policymaker, supervisor, and manager. He is sued in his individual capacity for acts committed under color of state law.

12. Defendant Deputy Chief FRED HAAS ("HAAS") was, at all relevant times, the head of DSD, with all of the duties and authority attendant to his position as a policymaker, supervisor, and manager. He is sued in his individual capacity for acts committed under color of state law.

13. Defendant Captain BRIAN FUCILE ("FUCILE") was, at all relevant times, the North Tower Bureau Captain, with all of the duties and authority attendant to his position as a policymaker, supervisor, and manager. He is sued in his individual capacity for acts committed under color of state law.

14. Defendant Captain SCOTT ZAVSZA ("ZAVSZA") was, at all relevant times, the Central Booking Bureau Captain, with all of the duties and authority attendant to his position as a policymaker, supervisor, and manager. He is sued in his individual capacity for acts committed under color of state law.

15. Defendant LEAH ANDERSON ("ANDERSON") was, at all relevant times, the Director of the Administrative Operations Bureau, with all of the duties and authority attendant to her position as a policymaker, supervisor, and manager. She is sued in her individual capacity for acts committed under color of state law.

16. The defendants identified in paragraphs 11-15 will be referred to collectively as the "LVMPD Supervisory Defendants."

17. Defendant Officer ALYSSA WILLIAMS (#19296) ("WILLIAMS") was, at all relevant times, a correctional officer assigned to the 2ABG module in the North Tower section of CCDC. She is sued in her individual capacity for acts committed under color of state law.

18. Defendant Officer JULIAN ABRAM (#18997) ("ABRAM") was, at all relevant times, a correctional officer assigned to the 2ABG module in the North Tower section of CCDC. He is sued in his individual capacity for acts committed under color of state law.

19. Defendant Officer DOUGLAS THRASHER (#18433) ("THRASHER") was, at all relevant times, a correctional officer assigned to the 2ABG module in the North Tower section of CCDC. He is sued in his individual capacity for acts committed under color of state law.

20. Defendants DOES 1-5 were, at all relevant times, other policymakers, supervisors, and managers of LVMPD/DSD, correctional officers, employees, and agents of LVMPD/DSD who were responsible for ensuring that the detainees held at CCDC, including MARTINEZ, were afforded basic safety, medical and mental health care, and the benefits conferred by the ADA

and RA. These defendants, who are fictitiously named until their identities can be ascertained, are sued in their individual capacities for acts committed under color of state law.

21. The defendants identified in paragraphs 17-19 will be referred to collectively as the "LVMPD Correctional Officer Defendants."

22. The defendants identified in paragraphs 11-20 will be referred to collectively as the "LVMPD Defendants."

23. Defendant WELLPATH, LLC ("WELLPATH") is a for-profit private corporation that was, at all relevant times, contractually obligated to provide adequate medical and mental health care to the detainees held at CCDC, including MARTINEZ.

24. Like LVMPD, WELLPATH promulgates, implements, and executes policies related to the conditions of confinement at CCDC. WELLPATH is also responsible for the training, supervision, discipline, and conduct of its employees and agents at CCDC. WELLPATH is therefore liable to Plaintiff under a theory of *respondeat superior* for all claims where such vicarious relief is available.

25. Defendant Doctor LARRY WILLIAMSON ("WILLIAMSON") was, at all relevant times, WELLPATH's Medical Director for CCDC, with all of the duties and authority attendant to his position as a policymaker, supervisor, and manager. He is sued in his individual capacity for acts committed under color of state law.

26. Defendant CATHERINE RYAN ("RYAN") was, at all relevant times, WELLPATH's Health Services Administrator ("HSA") for CCDC, with all of the duties and authority attendant to her position as a policymaker, supervisor, and manager. She is sued in her individual capacity for acts committed under color of state law.

27. Defendant Doctor JESSICA ARABSKI ("ARABSKI") was, at all relevant times, WELLPATH's Director of Psych Services for CCDC, with all of the duties and authority attendant to her position as a policymaker, supervisor, and manager. She is sued in her individual capacity for acts committed under color of state law.

28. Defendants Doctor RICHARD MEDRANO ("MEDRANO") and Doctor VIVEK SHAH ("SHAH") were, at all relevant times, WELLPATH's Regional Medical Director(s) for CCDC, with all of the duties and authority attendant to their positions as policymakers, supervisors, and managers. They are sued in their individual capacities for acts committed under color of state law.

29. Defendant COLE CASEY ("CASEY") was, at all relevant times, WELLPATH's Regional Vice President for CCDC, with all of the duties and authority attendant to his position as a policymaker, supervisor, and manager. He is sued in his individual capacity for acts committed under color of state law.

30. Defendant KESHA POLAND ("POLAND") was, at all relevant times, WELLPATH's Regional Director of Operations for CCDC, with all of the duties and authority attendant to her position as a policymaker, supervisor, and manager. She is sued in her individual capacity for acts committed under color of state law.

31. The defendants identified in paragraphs 25-30 will be referred to collectively as the "WELLPATH Supervisor Defendants."

32. Defendant Nurse Practitioner RACHEL CLARK ("CLARK") was, at all relevant times, WELLPATH's nurse practitioner at CCDC. She is sued in her individual capacity for acts committed under color of state law.

33. Defendant Nurse Practitioner EARL SALVIEJO ("SALVIEJO") was, at all relevant times, WELLPATH's nurse practitioner at CCDC. He is sued in his individual capacity for acts committed under color of state law.

34. Defendant Registered Nurse MARIA HOPKINS ("HOPKINS") was, at all relevant times, WELLPATH's registered nurse at CCDC. She is sued in her individual capacity for acts committed under color of state law.

35. Defendant Physician Assistant KYLE MARTINEAU ("MARTINEAU") was, at all relevant times, WELLPATH's physician assistant at CCDC. He is sued in his individual capacity for acts committed under color of state law.

36.  Defendant Registered Nurse ULYANA BILOSKURSKA ("BILOSKURSKA") was, at all relevant times, WELLPATH's registered nurse at CCDC. She is sued in her individual capacity for acts committed under color of state law.

37.  Defendant Mental Health Professional AMY KATHRYN ANAPOLSKY ("ANAPOLSKY") was, at all relevant times, WELLPATH's mental health professional at CCDC. She is sued in her individual capacity for acts committed under color of state law.

38. Defendants DOES 6-10 were, at all relevant times, policymakers, supervisors, medical and mental health providers of WELLPATH who were responsible for ensuring that the detainees held at CCDC, including MARTINEZ, were provided with adequate medical and mental health care. These defendants, who are fictitiously named until their identities can be ascertained, are sued in their individual capacities for acts committed under color of state law.

39. The defendants identified in paragraphs 32-37 will be referred to collectively as the "WELLPATH Provider Defendants."

40. The defendants identified in paragraphs 25-38 will be referred to collectively as the "WELLPATH Defendants."

41. The defendants identified in paragraphs 32-38, 25-30, 17-20, and 11-15 will be referred to collectively as the "Individual Defendants," whereas LVMPD and WELLPATH will be referred to collectively as the "Entity Defendants."

## FACTUAL ALLEGATIONS

**MARTINEZ's detention and death by starvation**

42. On December 3, 2022, MARTINEZ, a 33-year-old man with schizophrenia, was arrested and booked into CCDC, where he was held as a pre-trial detainee.

43. On December 4, 2022, as part of the intake process, HOPKINS, a registered nurse, evaluated MARTINEZ, and recommended that he be placed in Psych Housing "Male Closed" in the 2ABG module of North Tower as evidenced by the Internal Housing Form with bate stamp Wellpath 00030.

44. According to CIRT recommendation, bate stamps LVMPD 001250-001251, all cells in 2ABG module did not have surveillance cameras, only in the day room. At that time, the only units that had cameras installed inside the cells were North Tower Bureau 2C, 2D and 2EF modules. HOPKINS should have recommended one of these housing modules for MARTINEZ where he could receive more adequate monitoring.

45. In the 2ABG module, MARTINEZ's schizophrenia began to manifest in extreme paranoia, among other symptoms. MARTINEZ did not take any of his prescribed medication and he refused his meals, which he believed were poisoned, which he reported to multiple of his providers.

46. According to his cellmate, on the rare occasion that MARTINEZ did eat, he would immediately purge and/or vomit. This continued for weeks and MARTINEZ's weight dropped precipitously. It should be noted that previously in 2010 Martinez was incarcerated at CCDC and refused to eat during that incarceration. As a result, he was transferred to Rawson Neal Psychiatric Hospital on a Legal 2000 on December 22, 2010, after being transported to St. Rose Hospital. Therefore, Martinez had previously demonstrated the same symptoms of schizophrenia to the same parties.

47. On January 18, 2023, the Honorable Christy Craig, a judge of the Clark County District Court, declared that MARTINEZ was incompetent to stand trial. Judge Craig ordered that "the Sheriff . . . shall" transfer MARTINEZ from CCDC to the Division of Public and Behavioral Health of the Department of Health and Human Services "for detention and treatment at a secure facility operated by that Division . . ." The judge also ordered that MARTINEZ be examined by a licensed physician, physician assistant, or advanced nurse practitioner to ensure that he was transferred to a facility that was equipped to provide adequate medical and mental health care. MARTINEZ was in fact evaluated by three different medical professionals pursuant to that order at CCDC. They also submitted reports pursuant to their evaluations.

48. As the head of LVMPD and the individual named in Judge Craig's order, MCMAHILL was personally responsible for ensuring that MARTINEZ was released and transferred to an appropriate facility.

49. The other LVMPD supervisors who were responsible for effecting the judge's order were HAAS, who was MCMAHILL's chief deputy and the head of DSD, ZAVSZA, who was the Central Bureau Booking Captain and was therefore in charge of booking and releasing CCDC detainees, and FUCILE, who was the North Tower Bureau Captain and was therefore in charge of LVMPD operations within North Tower.

50. Despite Judge Craig's order and MARTINEZ's worsening condition, MCMAHILL, HAAS, ZAVSZA, and FUCILE did not take any steps to cause MARTINEZ to be transferred to a hospital or even to a medical unit within CCDC. Instead, they allowed him to remain in the 2ABG module of North Tower, where his health continued to deteriorate.

51. During his confinement in the 2ABG module, MARTINEZ was repeatedly evaluated by WELLPATH providers in connection with his failure to take medication and eat food.

52. CLARK appears to have been his primary front line mental health provider, and evaluated MARTINEZ on at least three occasions, including December 12, 2022, January 9, 2023, and February 7, 2023, as evidenced by Psychiatric Initial Evaluation and Psychiatric Provider Progress Note Records with bate stamps Wellpath 00172-00177, Wellpath 00183-00187 and Wellpath 00178-00182 respectively.

53. BILOSKURSKA, a registered nurse, evaluated MARTINEZ at least six times, including, December 12, 2022, December 16, 2022, December 22, 2022, January 12, 2023, February 2, 2023, and February 3, 2023, as shown in the Mental Health Unit Rounds records with bate stamps Wellpath 00170-00171, Wellpath 00168-00169, Wellpath 00166-167, Wellpath 000160-00161, Wellpath 00154-00155 and Wellpath 00127-00132 respectively.

54. ANAPOLSKY, a mental health professional, evaluated MARTINEZ at least five times, including, December 29, 2022, January 5, 2023, January 20, 2023, and January 26, 2023, February 9, 2023, as shown in the Mental Health Unit Rounds records with bate stamps

Wellpath 00164-00165, Wellpath 00162-00163, Wellpath 00158-00159, Wellpath 00156-00157 and Wellpath 00152-00153 respectively.

55. MARTINEAU, a physician assistant, evaluated MARTINEZ on January 25, 2023, as recorded in the Provider Progress Note with bate stamp Wellpath 00211-00212.

56. A Provider Order with bate stamp Wellpath 00189 evidenced SALVIEJO, a nurse practitioner, evaluated MARTINEZ on February 4, 2023. SALVIEJO also "treated" MARTINEZ by prescribing nausea medication after MARTINEZ was seen vomiting a large amount of liquid in one of the North Tower day rooms.

57. Indeed, WILLIAMSON, who was the Medical Director for CCDC, personally evaluated MARTINEZ on December 12, 2022, and December 26, 2022, as recorded in Provider Progress Notes with bate stamps Wellpath 00126-00127 and Wellpath 00213.

58. Thus, while he was confined in the 2ABG module, MARTINEZ was evaluated by WELLPATH mental health and medical providers, including the Medical Director, on no fewer eight occasions spanning two months.

59. Each of these providers had direct, personal knowledge of the fact that MARTINEZ was not taking his medication, was not eating food, and was regularly purging and vomiting.

60. And yet, these providers utterly failed to intervene. They did not order or request that MARTINEZ be transferred to a hospital or medical unit, where he could receive proper monitoring and care. They did not track his consumption with a food log, which is standard practice when detainees repeatedly refuse meals. And they did not order or request medical intervention of any kind. Instead, they simply filled out medication refusal forms and left MARTINEZ to starve in his cell.

61. By February 14, 2023, MARTINEZ had been in CCDC custody for 73 days, including 27 days after Judge Craig ordered that he be released and transferred to a DHHS facility. MARTINEZ's weight had dropped by approximately 70 pounds. His pupils were dilated, and he was so weak that he could barely walk the short distance from his cell to the dayroom 10 days before as observed in video produced by LVMPD.

62. When lunch was served around 11:00 am, MARTINEZ tried to eat, but struggled to keep anything down. And when the cell door was opened for free time around 2:00 pm, MARTINEZ was too weak to leave his bunk.

63. When dinner was served around 4:15 pm, MARTINEZ remained in his bunk and made no effort to eat.

64. According to his cellmate, MARTINEZ stopped snoring around this time, as reported in the LVMPD Public Report with bate stamps LVMPD 000114-000115, but the correctional officers who were responsible for conducting visual checks did not notice. This is confirmed by surveillance footage, and shift logs from the 2ABG module, with bate stamps LVMPD 000015-000019, which shows correctional officers, WILLIAMS, and ABRAM conducting cursory visual checks of the cell for the hours while MARTINEZ was dying. THRASHER was assigned to conduct visual checks as noted in the shift logs.

65. Approximately two and a half hours after MARTINEZ stopped breathing, WILLIAMS and ABRAM entered the cell and found him lying on his bunk, unresponsive. The officers then issued a "Code 99" call for emergency medical care.

66. When nurse practitioner Sterner responded to the Code 99 call, she was unable to intubate MARTINEZ due to rigor mortis in his jaw, as stated in WELLPATH 00209, which suggests, consistent with the timeline offered by MARTINEZ's cellmate, that he had been dead for several hours.

67. Martinez has always been mentally ill, but he was physically healthy. Prior incarceration records show that there was nothing wrong with him physically when he was screened upon booking as evidenced by his weight when he entered CCDC.

68. Defendants knew that Martinez had been refusing medication for his entire stay in CCDC, yet he failed to create a treatment plan that adjusted to his condition. They already knew he would not take medication, yet they did the same thing repeatedly without any changes in strategy.

69. The above defendants were going through the motions by documenting notes that stated the same thing week after week, which should have been a clear sign for them to do

something. Moreover, as if the facts above are not enough to show deliberate indifference, when they found Martinez in his cell, he had already been dead for hours as evidenced by rigor mortis. Had they been doing their jobs, they would have known that Martinez was struggling for his life, and they could have given him medical attention and Martinez could still be alive today.

70. However, Martinez was not monitored. He was dead for at least two hours as evidenced by the drop in his body temperature and the settling in of rigor mortis.

71. Ultimately, LVMPD and Wellpath cannot claim in any way that they did not know of the risks of what could happen to Martinez when they gave him no attention. It is impossible for them to not know of Martinez condition because it was evident from his behaviors and his weight loss. Records show that the same staff from LVMPD and Wellpath were assigned to 2ABG. This means they saw him, and they saw how he deteriorated and yet they failed to act. They failed to give him minimal attention and medical help. They chose to ignore the risks. They chose indifference.

**WELLPATH and LVMPD's custom, pattern, and practice of failing to adequately house, monitor, treat, and care for mentally ill individuals within their custody and control**

72. WELLPATH is the nation's largest for-profit provider of medical and mental health care to correctional facilities, including facilities located in 37 states.[1]

73. WELLPATH has attained this position, in part, through a well-publicized policy of "cost containment," whereby WELLPATH "work[s] to create efficiencies in staffing, pharmacy, and off-site costs . . ." and markets those "efficiencies" to local governments seeking to reduce expenditures associated with operating their facilities.[2]

---

[1]    Blake Ellis and Melanie Hicken, CNN Investigation, CNN (June 2019), https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/; Correct Care Solutions RFP 18-026, Lancaster County Youth Service Center.

[2]    *See* Correct Care Solutions RFP 18-026, Lancaster County Youth Service Center.

74. As detailed in a CNN investigation published in June of 2019 (the year WELLPATH entered a contract with LVMPD), WELLPATH's policy of "cost-containment" has caused the company's employees and agents to "fail to spot and/or treat serious psychiatric disorders," leading to lawsuits arising from "more than seventy deaths" over the previous five years.[3]

75. Based on interviews with current and former WELLPATH employees, CNN determined that the company "has repeatedly relied on inexperienced workers, offered minimal training and understaffed facilities."[4]

76. WELLPATH employees have complained that "specialized testing, medication, and treatments were often denied," and medical units were often understaffed, leading to medical errors.[5]

77. In December of 2018, the Department of Justice Civil Rights Division ("DOJ") investigated the state of the medical and mental health care provided by WELLPATH at a prison in Virginia. The investigation concluded that WELLPATH and the jail failed to provide constitutionally adequate medical and mental health care to prisoners.[6]

78. The DOJ found that the care provided by WELLPATH was deficient in myriad ways, including, *inter alia*:

　　a. A "failure to properly screen prisoners with mental illnesses," including by using nurses who are inadequately trained to identify mental illnesses,[7]

　　b. A "deficient intake process and lack [of] access to appropriate medical and mental health needs [,]"[8]

---

[3]　　Blake Ellis and Melanie Hicken, CNN Investigation, CNN (June 2019), https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/.
[4]　　*Id.*
[5]　　*Id.*
[6]　　United States Department of Justice, Civil Rights Division, Hampton Roads Investigation Notice (December 19, 2018) at p.1, https://www.documentcloud.org/documents/5978540-Hampton-Roads-DOJ-report.html.
[7]　　*Id.* at 5, 19.
[8]　　*Id.* at p. 9, 19.

c.  "Inadequate and inaccurate" record maintenance,[9]

d.  "Inadequate quality of care," including "failing to provide adequate mental health treatment," "failing to adequately administer medications and psychotherapy," and "placing prisoners with serious mental illness in restrictive housing for prolonged periods,[10]

e.  Inadequate medical staffing levels and continuity of care for those suffering from chronic illnesses,[11] and

f.  Inadequate monitoring systems.[12]

79.  The DOJ determined that prison officials evinced deliberate indifference to prisoners' constitutional rights to adequate medical and mental health care, in part, by renewing their contract with WELLPATH after becoming aware of the company's "failure to provide appropriate clinically necessary medical services . . . ."[13]

80.  Despite WELLPATH's sordid and well-publicized reputation for providing constitutionally inadequate medical and mental health care, including to detainees at the Las Vegas City Jail, in 2019, LVMPD entrusted the company with the provision of such care to detainees at CCDC.[14]

81.  While various provisions of the contract nominally require WELLPATH to provide constitutionally adequate medical and mental health care, ANDERSON, who was the Director of the Administrative Operations Bureau and was therefore responsible for contract auditing and compliance, did not enforce those provisions.

---

[9]  *Id.*
[10]  *Id.* at 1, 13, 21.
[11]  *Id.* at 14-15, 23-24.
[12]  *Id.* at 16.
[13]  *Id.* at 5.
[14]  *See, e.g.*, *Blue v. City of Las Vegas*, Case No. 2:21-cv-00372-RFB-DJA (Doc. 56) (schizophrenic inmate under WELLPATH'S care starved to death in isolation cell); *Shorter v. City of Las Vegas*, Case No. 2:16-cv-00971-KJD-DJA (Doc. 1); *Donatell v. City of Las Vegas*, Case No. 2:15-cv-023340-RFB-PAL (Doc. 81).

82. In the absence of meaningful contact enforcement, RYAN, WELLPATH's HSA for CCDC, POLAND, WELLPATH's Regional Director of Operations, and CASEY, WELLPATH's Regional Vice President, have allowed the facility to suffer from chronic staffing and quality of care issues.[15]

83. Meanwhile, WILLIAMSON, WELLPATH's Medical Director for CCDC, ARABSKI, WELLPATH's Director of Psych Services for CCDC, and MEDRANO and SHAH, WELLPATH's Regional Medical Directors, have previously allowed mentally ill inmates such as MARTINEZ to be improperly housed, monitored, and treated.

84. As a result, since WELLPATH assumed responsibility for the provision of medical and mental health care at CCDC, detainees have been dying at an unprecedent rate, even as the jail population decreases.[16]

85. And yet, MCMAHILL and HAAS have refused to report these deaths, as required by Assembly Bill 301.[17]

## FIRST CLAIM FOR RELIEF

### DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS

#### (42 U.S.C., § 1983; Nevada Constitution, Article 1, § 8)

#### Special Administrator v. Individual Defendants

86. Plaintiff hereby incorporates the facts alleged in the preceding sections and further alleges as follows:

---

[15]     These individuals are regularly included in email correspondence concerning staffing and quality of care issues at CCDC.

[16]     Adyn Runnels, Jails in Clark County ignoring 2019 law designed to increase transparency on in-custody deaths, Las Vegas Sun (April 2024), https://lasvegassun.com/news/2024/apr/07/jails-in-clark-county-ignoring-2019-law-designed-t/; *Smith v. Las Vegas Metropolitan Police Department*, Case No. 2:23-cv-00092-JAD-NJK (Doc. 10) (schizophrenic inmate under LVMPD and WELLPATH's care died from withdrawal after being placed in isolation rather than a medical unit); *Lewis v. City of Henderson*, Case 2:21-cv-01128-APG-VCF (Doc. 1).

[17]     *Id.*

87. Individuals held in state custody have a constitutional right to adequate medical and mental health care.

88. For pre-trial detainees, this right is secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article 1, section 8, of the Nevada Constitution.

89. According to the Ninth Circuit in *Sandoval v. County of San Diego*, "pretrial detainees alleging that jail officials failed to provide constitutionally adequate medical care must show: (1) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined including a decision with respect to medical treatment; (2) those conditions put the plaintiff at substantial risk of suffering serious harm; (3) the defendant did not take reasonably available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (4) by not taking such measures, the defendant caused the plaintiff's injuries." 985 F.3d 657, 669 (9th Cir. 2021) (*Sandoval*) (citing *Gordon v. County of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018) (*Gordon*)). "To satisfy the third element, the plaintiff must show that the defendant's actions were 'objectively unreasonable,' which requires a showing of 'more than negligence but less than subjective intent—something akin to reckless disregard.'" *Sandoval*, 985 F.3d at 669 (quoting *Gordon*, 888 F.3d at 1125).

90. In this case, the Individual Defendants made intentional decisions regarding the conditions under which MARTINEZ was confined, including, but not limited to, where MARTINEZ was housed and whether and how he was monitored, treated, and transferred during his confinement.

91. These decisions put MARTINEZ at substantial risk of suffering serious harm because they allowed him to starve to death over the course of 73 days.

92. The Individual Defendants did not take reasonably available measures to abate that risk, such as transferring MARTINEZ to a hospital or medical unit or ensuring that he was medicated and eating food.

93. As a result of these acts and omissions, MARTINEZ starved to death.

94. Not only did the Individual Defendants cause MARTINEZ's death; they callously exacerbated his pain and suffering over the course of 73 days.

95. In so doing, the Individual Defendants acted willfully, recklessly, and with deliberate indifference, thereby depriving MARTINEZ of his clearly established rights to adequate medical and mental health care.

96. The Individual Defendants are therefore liable for compensatory and punitive damages, as well as attorneys' fees.

**SECOND CLAIM FOR RELIEF**

**DEPRIVATION OF FAMILIAL ASSOCIATION**

**(42 U.S.C. § 1983; (42 U.S.C., § 1983; Nevada Constitution, Article 1, § 8)**

**ESPARZA v. Individual Defendants**

97. Plaintiff hereby incorporates the facts alleged in the preceding sections and further alleges as follows:

98. A parent has fundamental liberty interests in companionship and association with his or her child. These interests are secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article 1, section 8, of the Nevada Constitution.

99. A jail official and medical provider can be held liable for depriving a parent of his or her interests in companionship and association with his or her child when the official's underlying constitutional violation is sufficiently egregious to shock the conscience. A jail official's conduct shocks the conscience when the official had time to deliberate before acting or failing to act.

100.    As described in Plaintiffs' first claim for relief, the acts and omissions of the Individual Defendants violated the Fourteenth Amendment to the United State Constitution and Article 1, section 8 of the Nevada Constitution.

101.    These acts and omissions shock the conscience because the Individual Defendants had an enormous amount of time to deliberate, but nevertheless failed to transfer MARTINEZ to a hospital or medical unit or ensure that he was medicated and eating food.

102.    As a result of these unconscionable acts and omissions, the Individual Defendants have deprived ESPARZA of what should have been a lifetime of companionship and association with her son.

103.    The Individual Defendants are therefore liable to Plaintiff for compensatory and punitive damages, as well as attorneys' fees.

### THIRD CLAIM FOR RELIEF

**OVERDETENTION**

**(42 U.S.C. § 1983; Nevada Constitution, Article 1, § 8)**

**Special Administrator v. MCMAHILL, HAAS, ZAVSZA, and FUCILE**

104.    Plaintiffs hereby incorporate the facts alleged in the preceding sections and further allege as follows:

105.    Pre-trial detainees held in state custody have a constitutional right to be free from continued detention after it is known or should be known that the detainee is entitled to release.

106.    Freedom from incarceration is the paradigmatic liberty interest protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and by Article 1, section 8, of the Nevada Constitution.

107.    Defendants MCMAHILL, HAAS, ZAVSZA, and FUCILE unlawfully interfered with this interest when they halted, obstructed, or delayed MARTINEZ's court-ordered release and transfer to the care of DHHS, thereby preventing MARTINEZ from obtaining life-sustaining medical and mental health care.

108.    As a result of these acts and omissions, MARTINEZ starved to death.

109.    Not only did the above defendants cause MARTINEZ's death, they callously exacerbated his pain and suffering over the course of 73 days.

110.    In so doing, the above defendants acted willfully, recklessly, and with deliberate indifference, thereby depriving MARTINEZ of his clearly established rights to freedom from incarceration and adequate medical and mental health care.

111.    Defendants MCMAHILL, HAAS, ZAVSZA, and FUCILE are therefore liable to Plaintiff for compensatory and punitive damages, as well as attorneys' fees.

**FOURTH CLAIM FOR RELIEF**

**MUNICIPAL LIABILITY, FAILURE TO TRAIN/POLICY AND CUSTOM**

**(42 U.S.C. § 1983)**

**Special Administrator v. the Entity Defendants**

112.    Plaintiff hereby incorporates the facts alleged in the preceding sections and further alleges as follows:

113.    At all relevant times, LVMPD and WELLPATH maintained a policy and custom of failing to train and supervise front line officers and providers and failing to adequately house, monitor, treat, and care for mentally ill individuals within their custody and control, including by, *inter alia*:

   g.    Maintaining adequate staffing levels,

   h.    Effectively screening and identifying mentally ill detainees entering CCDC,

   i.    Appropriately housing such detainees,

   j.    Promptly transferring such detainees to a hospital or medical unit when ordered by the court or requested by a medical authority,

   k.    Consistently and adequately monitoring such detainees, especially those who fail to engage in self-care,

   l.    Providing adequate psychiatric and psychological care,

m. Ensuring that such detainees are medicated and eating food,

n. Humanely force-feeding starving detainees, and

o. Promptly summoning emergency services.

114.    As described in ¶¶ 31-42 the decision to contract with WELLPATH and the policies and customs listed above have resulted in an unprecedented death rate even as CCDC's population decreases. And LVMPD has sought to avoid accountability for this disaster by defiantly refusing to comply with the reporting requirement of AB 301.

115.    These policies and customs caused the Individual Defendants to act with deliberate indifference to the rights of mentally ill detainees, including MARTINEZ.

116.    LVMPD and WELLPATH, through their officials and agents, were well-aware that these policies and customs would result in the types of constitutional violations and injuries alleged herein. And yet, for reasons peculiar to each, including the pursuit of profit and political expediency, these officials and agents made the deliberately indifferent choice to maintain these policies and customs.

117.    WELLPATH and LVMPD are therefore liable to Plaintiff for compensatory damages, as well as attorneys' fees.

**<u>FIFTH CLAIM FOR RELIEF</u>**

**DISABILITY DISCRIMINATION IN VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT AND SECTION 504 OF THE REHABILITATION ACT**

**(42 U.S.C. 12131 *et seq.*; 29 U.S.C. § 794(a))**

**Special Administrator v. The Entity Defendants**

118.    Plaintiff hereby incorporates the facts alleged in the preceding sections and further alleges as follows:

119.    At all relevant times, MARTINEZ was protected under the ADA and RA because he suffered from, and was diagnosed with, schizophrenia, among other mental illnesses.

120.     This disability substantially limited MARTINEZ's major life activities, including, but not limited to, his ability to communicate with others, cope with the stress of confinement, and engage in basic self-care.

121.     CCDC receives federal funding to provide reasonable accommodations to disabled individuals such as MARTINEZ.

122.     LVMPD and WELLPATH, through their officials and agents, were aware of MARTINEZ's disabilities and the manner in which they limited his major life activities because they knew he was diagnosed with schizophrenia and because he had been confined in CCDC on prior occasions.

123.     Based on his disability, LVMPD and WELLPATH, through their officials and agents, housed MARTINEZ in "psych housing," where they knew he would not receive adequate medical and mental health care, as opposed to the medical unit that was available to other detainees.

124.     LVMPD and WELLPATH had ample time and opportunity to correct this discrimination by transferring MARTINEZ to a hospital or medical unit at little additional expense or risk. And yet, they chose not to.

125.     In so doing, LVMPD and WELLPATH failed to accommodate MARTINEZ's disability and discriminated against him based on the same.

126.     LVMPD and WELLPATH are therefore liable to Plaintiff for compensatory damages, as well as attorneys' fees.

**SIXTH CLAIM FOR RELIEF**

**WRONGFUL DEATH**

**ESPARZA v. All Defendants**

127.     Plaintiff hereby incorporates the facts alleged in the preceding sections and further alleges as follows:

128.     The Individual Defendants acted recklessly and negligently by:

        p.   Failing to maintain adequate staffing levels,

q.  Failing to effectively screen MARTINEZ,

r.  Failing to ensure that MARTINEZ was cared for by trained staff who understood his needs,

s.  Failing to house MARTINEZ in a unit that was suited to his needs,

t.  Failing to transfer MARTINEZ when ordered to do so,

u.  Failing to transfer MARTINEZ when it became apparent that doing so was medically necessary,

v.  Failing to consistently and adequately monitor MARTINEZ, including by regularly taking his weight and maintaining a food log to track his consumption,

w.  Failing to provide adequate psychiatric and psychological care,

x.  Failing to respond to MARTINEZ's starvation and dehydration,

y.  Failing to ensure that MARTINEZ was medicated and eating food,

z.  Failing to humanely force feed MARTINEZ,

aa. Failing to promptly summon emergency services, and

bb. Failing to properly train, supervise, and discipline those responsible for MARTINEZ's care and monitoring.

129.    As these acts and omissions caused MARTINEZ's death and were committed under color of law and within the scope of the Individual Defendants' employment, LVMPD and WELLPATH are vicariously liable for all permissible damages, fees, and costs under NRS 41.085 and 41.100.

## SEVENTH CLAIM FOR RELIEF

### NEGLECT OF A VULNERABLE PERSON

### Special Administrator v. All Defendants

130.    Plaintiff hereby incorporates the facts alleged in the preceding sections and further alleges as follows:

131.    At all relevant times, MARTINEZ suffered from and was diagnosed with schizophrenia, among other mental illnesses, making him a vulnerable person with the meaning of NRS 41.1395.

132.    The Individual Defendants' reckless and negligent conduct set forth in ¶ 87 amounted to abuse and neglect within the meaning of NRS 41.1395.

133.    As this conduct caused MARTINEZ's death and was committed under color of law and within the scope of the Individual Defendants' employment, LVMPD and WELLPATH are vicariously liable for all permissible damages, fees, and costs under NRS 41.085, 41.100, and 41.1395.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests entry of judgment in her favor and against all defendants to this action, as follows:

a. For compensatory damages, including general and special damages, survival damages, and wrongful death damages in an amount to be proven at trial,

b. For punitive damages against the Individual Defendants in an amount to be proven at trial,

c. For hedonic damages,

d. For funeral and burial expenses,

e. For interest, and

f. For attorneys' fees, costs, and such other and further relief as the court deems just and proper.

Plaintiff hereby demands a jury trial.

Dated this 22nd day of August 2024.          PETER GOLDSTEIN LAW CORP

/s/ Peter Goldstein
Peter Goldstein, SBN 6992

Attorney for Plaintiffs

Exhibit A

# STATE OF NEVADA
## CERTIFICATION OF VITAL RECORD

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
DIVISION OF PUBLIC AND BEHAVIORAL HEALTH
VITAL STATISTICS

CASE FILE NO.  4334541

## CERTIFICATE OF DEATH

**2023005138**
STATE FILE NUMBER

**TYPE OR PRINT IN PERMANENT BLACK INK**

| 1a. DECEASED-NAME (FIRST,MIDDLE,LAST,SUFFIX) **MARTINEZ** Jr / Fernando | 2. DATE OF DEATH (Mo/Day/Year) February 14, 2023 | 3a. COUNTY OF DEATH Clark |
|---|---|---|

**DECEDENT**

| 3b. CITY, TOWN, OR LOCATION OF DEATH Las Vegas | 3c. HOSPITAL OR OTHER INSTITUTION -Name(If not inter, give street and number) 330 S. Casino Center Blvd | 3e.If Hosp. or Inst. Indicate DOA,OP/Emer. Rm. Inpatient(Specify) Jail/Detention Center | 4. SEX Male |
|---|---|---|---|

| 5. RACE (Specify) White | 6. Hispanic Origin? Specify Yes - Mexican | 7a. AGE-Last birthday (Years) 33 | 7b. UNDER 1 YEAR MOS DAYS | 7c. UNDER 1 DAY HOURS MINS | 8. DATE OF BIRTH (Mo/Day/Yr) April 10, 1989 |
|---|---|---|---|---|---|

**IF DEATH OCCURRED IN INSTITUTION SEE HANDBOOK REGARDING COMPLETION OF RESIDENCE ITEMS**

| 9a. STATE OF BIRTH (If not US/CA. name country) Texas | 9b. CITIZEN OF WHAT COUNTRY United States | 10.EDUCATION 13 | 11. MARITAL STATUS (Specify) Never Married | 12. SURVIVING SPOUSE'S NAME (Last name prior to first marriage) |
|---|---|---|---|---|

| 13. SOCIAL SECURITY NUMBER | 14a. USUAL OCCUPATION (Give Kind of Work Done During Most of UNKNOWN/NOT CLASSIFIABLE | 14b. KIND OF BUSINESS OR INDUSTRY UNKNOWN/NOT CLASSIFIABLE | Ever in US Armed Forces? No |
|---|---|---|---|

| 15a. RESIDENCE - STATE | 15b. COUNTY | 15c. CITY, TOWN OR LOCATION | 15d. STREET AND NUMBER UNKNOWN | 15e. INSIDE CITY LIMITS (Specify Yes or No) |
|---|---|---|---|---|

**PARENTS**

| 16. FATHER/PARENT - NAME (First Middle Last Suffix) Fernando MARTINEZ SANTOS | 17. MOTHER/PARENT - NAME (First Middle Last Suffix) Sonia GRAJEDA |
|---|---|

| 18a. INFORMANT- NAME (Type or Print) Fernando MARTINEZ SANTOS | 18b. MAILING ADDRESS (Street or R.F.D. No. City or Town, State, Zip) 11145 E Rio Grande Ave #8 El Paso, Texas 79902 |
|---|---|

**DISPOSITION**

| 19a. BURIAL, CREMATION, REMOVAL, OTHER (Specify) Cremation | 19b. CEMETERY OR CREMATORY - NAME Paradise Valley Crematory | 19c. LOCATION City or Town Las Vegas | State Nevada 89119 |
|---|---|---|---|

| 20a. FUNERAL DIRECTOR - SIGNATURE (Or Person Acting as Such) **LAUREN A GUIDO** SIGNATURE AUTHENTICATED | 20b. FUNERAL DIRECTOR LICENSE NUMBER FD980 | 20c. NAME AND ADDRESS OF FACILITY Las Vegas Cremations - Eastern 6000 S Eastern Ave, Suite 2A  Las Vegas  NV  89119 |
|---|---|---|

**TRADE CALL**

TRADE CALL - NAME AND ADDRESS

**CERTIFIER**

| 21a. To the best of my knowledge, death occurred at the time, date and place and due to the cause(s) stated. (Signature & Title) | 22a. On the basis of examination and/or investigation, in my opinion death occurred at the time, date and due to the cause(s) stated. (Signature & Title) **JAN M GORNIAK DO** SIGNATURE AUTHENTICATED |
|---|---|
| 21b. DATE SIGNED (Mo/Day/Yr) | 21c. HOUR OF DEATH | 22b. DATE SIGNED (Mo/Day/Yr) March 29, 2023 | 22c. HOUR OF DEATH 20:03 |
| 21d. NAME OF ATTENDING PHYSICIAN IF OTHER THAN CERTIFIER (Type or Print) | 22d. PRONOUNCED DEAD (Mo/Day/Yr) February 14, 2023 | 22e. PRONOUNCED DEAD AT (Hour) 20:03 |

To Be Completed by CERTIFYING PHYSICIAN / To Be Completed by CORONER'S OFFICE

| 23a. NAME AND ADDRESS OF CERTIFIER (PHYSICIAN, ATTENDING PHYSICIAN, MEDICAL EXAMINER, OR CORONER) (Type or Print) Jan M Gorniak DO  1704 Pinto Lane Las Vegas, NV  89106 | 23b. LICENSE NUMBER DO1796 |
|---|---|

**REGISTRAR**

| 24a. REGISTRAR (Signature) **NANCY BARRY** SIGNATURE AUTHENTICATED | 24b. DATE RECEIVED BY REGISTRAR (Mo/Day/Yr) March 29, 2023 | 24c. DEATH DUE TO COMMUNICABLE DISEASE YES ☐  NO ☒ |
|---|---|---|

**CAUSE OF DEATH**

| 25. IMMEDIATE CAUSE (ENTER ONLY ONE CAUSE PER LINE FOR (a), (b), AND (c).) | Interval between onset and death |
|---|---|
| PART I (a) Hypertensive Cardiovascular Disease | |
| DUE TO, OR AS A CONSEQUENCE OF: (b) | Interval between onset and death |
| DUE TO, OR AS A CONSEQUENCE OF: (c) | Interval between onset and death |
| DUE TO, OR AS A CONSEQUENCE OF: (d) | Interval between onset and death |

**CONDITIONS IF ANY WHICH GAVE RISE TO IMMEDIATE CAUSE STATING THE UNDERLYING CAUSE LAST**

| PART II OTHER SIGNIFICANT CONDITIONS-Conditions contributing to death but not resulting in the underlying cause given in Part I. Renal Failure, Hypernatremic Dehydration, Unspecified Psychosis | 26. AUTOPSY (Specify Yes or No) Yes | 27. WAS CASE REFERRED TO CORONER (Specify Yes or No) Yes |
|---|---|---|

| 28a. ACC., SUICIDE, HOM., UNDET. OR PENDING INVEST. (Specify) | 28b. DATE OF INJURY (Mo/Day/Yr) | 28c. HOUR OF INJURY | 28d. DESCRIBE HOW INJURY OCCURRED |
|---|---|---|---|

| 28e. INJURY AT WORK (Specify Yes or No) | 28f. PLACE OF INJURY- At home, farm, street, factory, office building, etc. (Specify) | 28g. LOCATION | STREET OR R.F.D. No. | CITY OR TOWN | STATE |
|---|---|---|---|---|---|

"CERTIFIED TO BE A TRUE AND CORRECT COPY OF THE DOCUMENT ON FILE WITH THE REGISTRAR OF VITAL STATISTICS, STATE OF NEVADA." This copy was issued by the Southern Nevada Health District from State certified documents authorized by the State Board of Health pursuant to NRS 440.175.

DATE ISSUED:  8/28/2023

Registrar of Vital Statistics
*SIGNATURE AUTHENTICATED*
By: *Susan Bannis*

This Copy not valid unless prepared on engraved border displaying date, seal and signature of Registrar.
SOUTHERN NEVADA HEALTH DISTRICT • P.O. Box 3902 • Las Vegas, NV 89127 • 702-759-1010 • Tax ID # 88-0151573

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE



# Exhibit B

ELECTRONICALLY SERVED
10/26/2023 4:41 PM

Case 2:23-cv-02161-GMN-MDC    Document 65    Filed 11/08/24    Page 27 of 30

Electronically Filed
10/26/2023 4:39 PM

CLERK OF THE COURT

**OASA**
Peter Goldstein, Esq., (SBN 6992)
**PETER GOLDSTEIN LAW CORP**
10161 Park Run Drive, Suite 150
Las Vegas Nevada, 89145
Telephone:  702-474-6400
Facsimile:   888-400-8799
peter@petergoldsteinlaw.com

*Attorney for Petitioner,*
*Sonia Esparza*

## EIGHTH JUDICIAL DISTRICT COURT

## CLARK COUNTY, NEVADA

| | |
|---|---|
| In the Matter of the Estate of<br>FERNANDO MARTINEZ JR.<br><br>        Deceased, | Case No.:  P-23-117983-E<br><br>Dept. 26<br><br><u>ORDER</u> |

### ORDER APPOINTING SPECIAL ADMINISTRATOR AND FOR ISSUANCE OF
### SPECIAL LETTERS OF ADMINISTRATION

      Upon submission of a verified *ex parte* petition for appointment of a special administrator and for issuance of special letters of administration representing as follows:

      1.     Fernando Martinez Jr. ("Decedent") died intestate on February 14, 2023, in Clark County, Nevada.

      2.     Decedent was a resident of Clark County, Nevada when he died.

      3.     Petitioner has never been convicted of a felony.

      4.     Pursuant to NRS 139.040, the Decedent did not have a surviving spouse or children. Accordingly, a surviving parent is entitled to priority for appointment as a special administrator.

      5.     Sonia Esparza, the Decedent's mother, and Fernando Martinez-Santos, the

1    Decedent's father, are the Decedent's only heirs.

2        6.      At the time of the Decedent's death, one of the heirs and surviving parents,

3    Fernando Martinez-Santos, was estranged from the Decedent and had been for about 30 years. He

4    also resides in Texas

5        7.      A nomination, pursuant to NRS 139.050, is inapplicable here because petitioner

6    Sonia Esparza, the decedent's mother, is entitled to serve as a special administrator pursuant to

7    NRS 139.040.

8        8.      Petitioner Sonia Esparza, as the Decedent's mother, is the sole special administrator

9    of Decedent's Estate for purposes of filing and maintaining the Litigation of wrongful death

10   (which has not yet been filed).

11

12       **NOW THEREFORE IT IS HEREBY ORDERED** that Petitioner Sonia Esparza is

13   appointed as Special Administrator of the Estate of Fernando Martinez Jr. and that Special Letters

14   of Administration be issued, without bond, to Petitioner Sonia Esparza upon taking the oath of

15   office, for the purpose of administering the estate in accordance with Nevada Revised Statutes

16   Chapter §140.040.

17       **IT IS FURTHER ORDERED** that all moneys received by this Estate will be placed in

18   the attorney's trust account until further ordered by the Court.

19       **IT IS FURTHER ORDERED** that the settlement of the Decedent's lawsuit is subject to

20   this Court's approval.

21

22   Dated this ____ day of _____ ,2023.

**Dated this 26th day of October, 2023**

**AD2 B8E 0694 3540**
**Gloria Sturman**
**District Court Judge**

_____

District Court Judge

27   Respectfully submitted,

28

2

By:    /s/Peter Goldstein

     PETER GOLDSTEIN, ESQ. [SBN 6992]
     10161 Park Run Drive, Suite 150
     Las Vegas, Nevada 89145
     *Attorney for Petitioner*
     *Sonia Esparza*

**CSERV**

DISTRICT COURT
CLARK COUNTY, NEVADA

| In the Matter of: | CASE NO: P-23-117983-E |
| Fernando Martinez, Jr., Deceased | DEPT. NO.  Department 26 |

### AUTOMATED CERTIFICATE OF SERVICE

     This automated certificate of service was generated by the Eighth Judicial District Court. The foregoing Order Appointing Special Administrator was served via the court's electronic eFile system to all recipients registered for e-Service on the above entitled case as listed below:

Service Date: 10/26/2023

Peter Goldstein                                    peter@petergoldsteinlaw.com

Staff Peter Goldstein Law Corp                     staff@petergoldsteinlaw.com